697 So.2d 914 (1997)
In the Interest of B.S., C.S., and T.S., children.
C.S., mother, Appellant,
v.
STATE of Florida, DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 95-05063.
District Court of Appeal of Florida, Second District.
July 23, 1997.
Rehearing Denied August 22, 1997.
*915 Karol K. Williams, Tampa, for Appellant.
Steven Hurwitz and Wesley Pardue, Tampa, for Appellee.
PARKER, Chief Judge.
C.S. (the mother) appeals the trial court's order terminating her parental rights to her three children, B.S. (the baby), born March 1991, C.S. (the boy), born March 1990, and T.S. (the girl), born April 1988.[1] We affirm, concluding that there is clear and convincing evidence that the mother had the opportunity and capability to prevent egregious abuse to the baby and knowingly failed to do so. See § 39.464(4), Fla. Stat. (1993).
This family's involvement with Florida's Department of Health and Rehabilitative Services (HRS) began in March 1991 and continued through November 1995. All allegations of child abuse pertain to the baby. There is no evidence that either parent ever mistreated or abused the boy or the girl.
In March 1991, the newborn baby was placed in a shelter home by HRS because the parents tested positive for marijuana during a hospital blood screening. HRS filed a petition for dependency. In June 1991, the baby was returned to the parents under HRS's Early Services Intervention program. Four days later, the parents called Emergency Medical Services (EMS) because the father allegedly tripped and fell while carrying the baby. EMS brought the baby to Tampa General Hospital (TGH) where a small subdural hematoma was discovered in the frontal lobe of the brain. HRS intervened and returned the baby to shelter care.
On June 19, 1991, HRS filed a motion to determine whether it was safe to return the baby to the parents. Judge Giglio held a hearing on HRS's motion and found that the services provided by HRS were adequate to ensure the safety and well-being of the baby at home. Accordingly, Judge Giglio entered an order returning the baby to the parents. In July 1991, the parents stipulated to the dependency of the baby. The trial court adjudicated the baby dependent, but allowed the baby to remain in the parents' care under HRS supervision.
In September 1991, the mother brought the baby to TGH for the second time with a head injury. X-rays revealed that the baby also had two healing rib fractures that had occurred since the last treatment at TGH. As a result, HRS placed all three children in a shelter home, moved to modify the baby's placement to foster care, and filed a petition alleging dependency for the boy and the girl. The children remained in the shelter home for a year.
In September 1992, Judge Giglio held an adjudicatory hearing on HRS's motion and second dependency petition. Judge Giglio found that the boy and the girl were dependent, *916 but withheld adjudication. All three children were returned to the parents.
In November 1992, EMS transported the baby to TGH in a seizure-like condition. This was the baby's third trip to TGH due to head injuries. The father was at home with the baby when the injuries occurred. The mother was at work at the time. Upon examination, the physicians discovered a new subdural hematoma located in the back of the brain plus bilateral retinal hemorrhaging. The baby also had several bruises. These are telltale signs of "Shaken Baby Syndrome." [2] Once again, HRS placed all three children in a shelter home.
Judge Giglio granted a motion to recuse and the case was reassigned to Judge Tharpe. In August 1994, Judge Tharpe held a dependency hearing and set aside the order withholding adjudication, making all three children dependent. The children subsequently were committed to HRS for foster care placement.
In September 1994, HRS filed a petition to terminate parental rights alleging the following grounds for termination:
(a) Pursuant to Florida Statute 39.464(3) (1993) the parent or parents have engaged in conduct towards the child or other children that demonstrates that continuing involvement of the parent or parents in the parent/child relationship threatens the life or well-being of the children without regard to provisions of services by the Department.
(b) Pursuant to Florida Statute 39.464(4) (1993) the parent or parents have engaged in egregious conduct that endangers the life, health or safety of the child or sibling or the parent or parents have had the opportunity and capability to prevent the egregious conduct that threatened the life, health or safety of the child or sibling and have knowingly failed to do so.
(c) Pursuant to Florida Statutes 39.464(5) (1993) the parents have abused and/or neglected the children as demonstrated by their failure to comply with the previous Court order and case plan with regard to these children.
Judge Tharpe held a hearing on the petition to terminate parental rights in October 1995. At the hearing, in addition to the facts stated above, the trial court was apprised of the following facts.
In 1977, the father pleaded guilty to manslaughter of his two-month-old child from a prior marriage. The adjudication was withheld and he was sentenced to fifteen years of probation, which he successfully completed. The mother testified that she was unaware of the 1977 incident until after they were married.
In February 1982, the mother and father took their first child, a two-month-old girl, to TGH. The girl died one day later of a large brain hemorrhage. An autopsy was performed at the parent's request. No allegations of child abuse were documented by the assistant medical examiner and no criminal charges were filed. The same assistant medical examiner testified in this termination proceeding, stating that he now believes that the 1982 death resulted from "Shaken Baby Syndrome."
The mother dissolved the marriage to the father in August 1994. Since then, the only contact between the mother and the father has been incidental contact.[3]
On November 22, 1995, the trial court granted HRS's petition to terminate parental rights. The trial court found that three grounds for terminating parental rights were substantiated by clear and convincing evidence. Those grounds were stated as follows:
1) That the parent or parents have engaged in conduct towards the children that demonstrates that continuing involvement *917 of the parent or parents in the parent/child relationship threatens the life or well-being of the children irrespective of the provision of services by the Department of Health and Rehabilitative Services.
2) That the parent or parents have engaged in egregious conduct that endangers the life, health or safety of the children and that the parent or parents have had the opportunity and capability to prevent the egregious conduct that threatened the life, health or safety and knowingly failed to do so.
3) That the parents have failed to comply with the previous court orders or case plans as evidenced by the repetition of unexplained injury to the child [the baby]. The court specifically finds that the parents have not offered adequate explanations for the repeated injuries to [the baby] and, therefore, all of the children's health or well-being is in danger.
We conclude that the trial court's second ground, that the parent or parents knowingly failed to prevent egregious abuse, requires this court to affirm the order terminating parental rights. Section 39.464, Florida Statutes (1993), states in pertinent part:
The department ... may petition for the termination of parental rights under any of the following circumstances:
....
(4) EGREGIOUS ABUSE.  The parent or parents have engaged in egregious conduct that endangers the life, health, or safety of the child or sibling, or the parents have had the opportunity and capability to prevent egregious conduct that threatened the life, health, or safety of the child or sibling and have knowingly failed to do so.... For the purposes of this subsection, "egregious abuse" means conduct of the parent or parents that is deplorable, flagrant, or outrageous by a normal standard of conduct. "Egregious abuse" may include an act or omission that occurred only once, but was of such intensity, magnitude, or severity as to endanger the life of the child.
§ 39.464(4), Fla. Stat. (1993) (emphasis added).
The trial court's finding, failure to prevent egregious abuse, is sufficient by itself to terminate the mother's parental rights and is substantiated by the record. The record indicates that the mother acquiesced in the father's supervision of the baby while she was away from the home, despite the history and sensitive nature of this case. The baby, by the age of twenty months, had suffered a frontal subdural hematoma, a second subdural hematoma in the rear portion of her brain, rib fractures, and retinal hemorrhages in both eyes. Moreover, the mother knew that the father pleaded guilty to manslaughter and had been on probation for the 1977 death of his four-week-old son.
We recognize that clear and convincing evidence is a demanding level of proof. The Florida Supreme Court has defined it as an "intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy." Inquiry Concerning Davey, 645 So.2d 398, 404 (Fla.1994). However, "the trial court's determination that the evidence is clear and convincing will not be overturned unless it may be said as a matter of law that no one could reasonably find such evidence to be clear and convincing." In Interest of C.L., 654 So.2d 1039, 1040 (Fla. 4th DCA 1995); Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993), review denied, 634 So.2d 625 (Fla.1994); In Interest of D.J.S., 563 So.2d 655, 661-62 (Fla. 1st DCA 1990).
This court has conducted an exhaustive examination of this case, in part, because an affirmance will terminate the mother's rights to her children where there is no direct evidence that she ever physically injured the children. However, the record supports the conclusion that the baby was the victim of egregious abuse at the hands of one or both of her parents and that such abuse could have been prevented by the mother. "If reasonable men could differ as to the propriety of the action taken by the trial court, then the action is not unreasonable and there can be no finding of an abuse of discretion." *918 Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980).
Affirmed.
FRANK and LAZZARA, JJ., concur.
NOTES
[1] The trial court terminated the father's parental rights in the same order, but the father is not a party to this appeal.
[2] The clinical picture of "Shaken Baby Syndrome" includes: "bleeding in the ocular orbits, bleeding at the base of the brain around the bottom of the skull, a lack of responsiveness to cognitive stimuli, and broken upper arms or ribs (because of the parent's strength of grip)." Carolyn J. Levitt, et al., Child Abuse: Medical Diagnosis and Management 1, 3-4 (Robert M. Reece ed., 1994).
[3] The mother testified that an HRS official told her that a divorce was the only way she could hope to regain custody of her children.