843 So.2d 996 (2003)
N.L., mother of S.W., a child, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Appellee.
No. 1D02-0454.
District Court of Appeal of Florida, First District.
May 1, 2003.
*997 Mary C. O'Rourke, Esquire of Three Rivers Legal Services, Inc., Gainesville, for Appellant.
Phillippa G. Hitchins, Esquire, Lake City, for Appellee.
PER CURIAM.
N.L., the mother of S.W., appeals an order terminating her parental rights. The court below found that both subsections 39.806(1)(c) and (1)(f), Florida Statutes (2000), authorized termination of parental rights. Because the record contains no competent substantial evidence supporting termination under subsection (1)(f) of section 39.806 and contains no evidence of the provision of services (or the futility of providing services) necessary for termination under subsection (1)(c), we reverse and remand.

Background
On the morning of October 20, 2000, N.L. took her nine-month-old daughter, S.W., to a hospital emergency room because the child's left arm was red and swollen. X-rays revealed a fracture at the proximal end of the left humerus ten to fourteen days old. Emergency room personnel placed a call to the abuse hotline maintained by the Department of Children and Family Services (DCFS). The police were contacted, and N.L. was interrogated. N.L. told both the emergency room personnel and the police that her live-in boyfriend, S.W.'s father, had said that, when the child reached around his neck the evening before, he heard a popping noise. The boyfriend reiterated this account. A nurse practitioner affiliated with *998 the Child Protection Team examined the child and concluded that the fracture was the result of child abuse.
DCFS employees took custody of the child and later filed an emergency shelter petition asserting child abuse. The trial court granted the petition by order entered on October 23, 2000, giving DCFS legal custody of the child. DCFS eventually placed S.W. with her maternal grandmother in North Carolina. Neither this placement decision nor the emergency shelter order is at issue on the present appeal.
Without preparing a case plan or offering to do so, DCFS filed a petition for termination of parental rights. As amended, the petition alleged that both parents engaged in egregious conduct or had the opportunity and ability to prevent egregious conduct detrimental to S.W. and knowingly failed to do so, within the meaning of section 39.806(1)(f), Florida Statutes (2000). The amended petition also alleged that both parents engaged in conduct that threatened S.W.'s life, safety, well-being, or health within the meaning of section 39.806(1)(c), Florida Statutes (2000), irrespective of the provision of services.
In January 2001, the boyfriend consented to, and the trial court subsequently ordered, termination of his parental rights. In March 2001, the boyfriend pleaded guilty to aggravated child abuse of S.W. and was sentenced for that offense.
The DCFS petition remained pending as to N.L. and came on for hearing on May 2, 2001. A radiologist testified that, based on the extent to which they had healed, S.W.'s fractures had occurred ten to fourteen days before x-rays were taken of S.W. on October 20, 2000. These and other x-rays revealed fractures of S.W.'s right tibia, left tibia, and left humerus. In every case, the fractures were "metaphyseal," or near the ends of the bones. William Alison Cumming, a professor of medicine at the University of Florida with approximately 30 years of experience in pediatric radiology, testified that S.W.'s fractures were, in his opinion, "due to the child being rapidly and forcibly shaken probably while held by the trunk with the limbs free to flail about."
Dr. Cumming also testified that the fractures were probably inflicted without bruising. He testified further that, for a long time after these injuries were inflicted, S.W. may have exhibited no signs of the fractures or of any kind of physical distress as a result of the fractures. In Dr. Cumming's opinion, the fractures might have been the result of a single shaking episode of very brief duration.
N.L. testified that, as the child's primary caretaker, she spent as much time with the child as she could. Conceding that there were times when she was not with the child, such as when she went to the bathroom, took a shower, or went to the store, she testified that she believed the longest period that the child had not been in her care lasted no more than a half hour. When not in her care, the child was in the boyfriend's care. She testified that she never saw any indication when she returned from the store, bathroom, or shower, that the child had been injured.
A clinical coordinator with the Child Protection Team, who performed a psychosocial assessment of N.L. testified that she recommended N.L. receive a further psychological evaluation. She stated she could not testify as to whether N.L. posed any danger to the child and stated that a psychological evaluation was "imperative before any decision was made." The record does not indicate whether DCFS ever offered or sought a psychological evaluation. Although a case plan appears in the record, it is unsigned and the record is devoid of evidence that a case plan was *999 offered to N.L. There is no record evidence that N.L. posed a risk to the child for "psychosocial" reasons that could not be ameliorated with the provision of services.
The trial court entered the order under review, terminating parental rights under both section 39.806(1)(c) and (1)(f), Florida Statutes (2000), and concluding that N.L. "has engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatened the life, safety, or physical, mental, or emotional health" of the child and that N.L. had "engaged in a course of conduct toward the child that demonstrates that her continuing involvement in the parent-child relationship threatens the well being of the child."

Standard of Review
We are obliged to affirm the termination of parental rights if DCFS has met its burden to present clear and convincing evidence of a statutory ground for terminating parental rights, along with clear and convincing evidence that terminating parental rights is in the best interests of the child. See § 39.809(1), Fla. Stat. (2000). Clear and convincing evidence is defined as "an `intermediate level of proof [that] entails both a qualitative and quantitative standard. The evidence must be credible; the memories of the witnesses must be clear and without confusion; and the sum total of the evidence must be of sufficient weight to convince the trier of fact without hesitancy.'" In re Adoption of Baby E.A.W., 658 So.2d 961, 967 (Fla. 1995), cert. denied, 516 U.S. 1051, 116 S.Ct. 719, 133 L.Ed.2d 672 (1996) (quoting In re Davey, 645 So.2d 398, 404 (Fla.1994)).
Our standard of review is highly deferential. A finding that evidence is clear and convincing enjoys a presumption of correctness and will not be overturned on appeal unless clearly erroneous or lacking in evidentiary support. See T.C.B. v. Fla. Dep't of Children & Families, 816 So.2d 194, 197-98 (Fla. 1st DCA 2002); C.W. v. Dep't of Children & Families, 814 So.2d 488, 492 (Fla. 1st DCA), rev. denied, 823 So.2d 122 (Fla.2002). Sitting en banc in In Interest of D.J.S., 563 So.2d 655, 662 (Fla. 1st DCA 1990), this court affirmed the trial court's termination of parental rights, concluding "that the trial court's determination that the evidence is clear and convincing ... cannot be held to be unreasonable as a matter of law." The D.J.S. court explained the standard of review in termination cases, as follows:
We hold that a trial court's determination that evidence is clear and convincing will not be overturned unless it may be said as a matter of law that no one could reasonably find such evidence to be clear and convincing.
* * *
Our review of the record is not a de novo review or redetermination of the facts and issues. Even were we so inclined, we find no authorization for that procedure. Our review is addressed to the issues made on appeal and to the evidentiary support for, and correctness under the law of, the trial court's order on those issues.
Id.; see also McKesson Drug Co. v. Williams, 706 So.2d 352, 353 (Fla. 1st DCA 1998)("In civil cases involving the burden of clear and convincing evidence, an appellate court may not overturn a trial court's finding regarding the sufficiency of the evidence unless the finding is unsupported by record evidence, or as a matter of law, no one could reasonably find such evidence to be clear and convincing. Accordingly, the appellate court's function is not to conduct a de novo proceeding or reweigh the evidence by determining independently whether the evidence as a whole *1000 satisfies the clear and convincing standard, but to determine whether the record contains competent substantial evidence to meet the clear and convincing evidence standard." (citations omitted)). Further, as the Florida Supreme Court observed in E.A.W., in reviewing findings of the trial court made under a "clear and convincing" evidentiary standard,
[O]ur task on review is not to conduct a de novo proceeding, reweigh the testimony and evidence given at the trial court, or substitute our judgment for that of the trier of fact. Instead, we will uphold the trial court's finding "if, upon the pleadings and evidence before the trial court, there is any theory or principle of law which would support the trial court's judgment in favor of terminating... parental rights."
658 So.2d at 967 (quoting Kingsley v. Kingsley, 623 So.2d 780, 787 (Fla. 5th DCA 1993), review denied, 634 So.2d 625 (Fla.1994)).
Thus, our review involves a two-step analysis. Where the trial court's findings that the evidence is clear and convincing are supported by competent substantial evidence,[1] and the appellate court cannot say that no one could reasonably find such evidence to be clear and convincing, the finding will not be set aside on appellate review. D.J.S., 563 So.2d at 662; E.A.W., 658 So.2d at 967; see also In re A.R.S., 617 So.2d 1148, 1149 (Fla. 2d DCA 1993)("Competent, substantial evidence supports the trial court's findings and decision that the evidence clearly showed neglect and abandonment....").

Subsection 39.806(1)(f)
To establish a prima facie case under section 39.806(1)(f), DCFS was required to prove egregious conduct on N.L.'s part or her knowing failure to prevent such conduct by another when an opportunity existed to do so. As grounds for termination of parental rights, section 39.806(1)(f) specifies situations where
the parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child....
2. As used in this subsection, the term "egregious conduct" means abuse, abandonment, neglect, or any other conduct of the parent or parents that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child.
§ 39.806(1)(f), Fla. Stat. (2000); see In re T.M., 641 So.2d 410, 410-12 (Fla.1994). In proving S.W.'s injuries and so the abuse to *1001 which she was subjected, DCFS proved "egregious conduct" here.
Shaking an infant violently can cause serious injury or death. See Washington v. State, 737 So.2d 1208, 1214 (Fla. 1st DCA 1999); Dixon v. State, 691 So.2d 515, 516 (Fla. 1st DCA 1997); Moore v. State, 790 So.2d 489, 492 (Fla. 5th DCA 2001); State v. Coffman, 746 So.2d 471, 472 (Fla. 2d DCA), rev. denied, 728 So.2d 201 (Fla.1998); Freeze v. State, 553 So.2d 750, 752 & n. 1 (Fla. 2d DCA 1989) (citing John Caffey, Whiplash Shaken Infant Syndrome: Manual Shaking by Extremities with Whiplash Induced Intracranial and Intraocular Bleedings, Linked with Residual Permanent Brain Damage and Mental Retardation, 54 Pediatrics 396 (1974)). Although Dr. Cumming did not testify explicitly that the abuse S.W. received endangered her life, the record contains competent and substantial evidence to support the trial court's finding of clear and convincing evidence that S.W. was harmed by "egregious conduct" understandably inferred from the fact that S.W. was shaken forcefully enough to break her bones.
But DCFS did not introduce competent and substantial evidence either that N.L. shook S.W. or that she knowingly failed to avert a shaking she had the opportunity and capability to prevent. The record reflects that N.L.'s boyfriend has pleaded guilty to aggravated child abuse for violently shaking S.W. Nothing in this record, however could support a finding that N.L. was aware that the boyfriend intended or was inclined to abuse S.W., or, before the visit to the emergency room, that he had done so.
The record contains no evidence that N.L. was physically present when S.W. was abused. See In re B.J., 737 So.2d 1227, 1228 (Fla. 2d DCA 1999) ("[W]here there is evidence that a child suffered abuse by one or both of the parents present, there is clear and convincing evidence of egregious abuse to support termination of parental rights of both parents."), rev. denied, 753 So.2d 564 (Fla.2000). N.L. repeatedly denied being present during any abuse, and DCFS offered no evidence to the contrary. No evidence in the record shows long-term abuse or a pattern of abuse of S.W. which might form a basis for a finding that N.L. "knowingly failed to prevent" the abuse of S.W. by the boyfriend. See M.C. v. Dep't of Children & Family Servs., 814 So.2d 449, 451-52 (Fla. 4th DCA 2001); Dep't of Children & Families v. Court of Appeal, Third District, 788 So.2d 988, 989-90 (Fla. 3d DCA 1998); In re B.S., 697 So.2d 914, 917 (Fla. 2d DCA 1997), rev. denied, 707 So.2d 1123 (Fla.1998); In re D.E.N., 504 So.2d 514, 516 (Fla. 5th DCA), rev. denied, 513 So.2d 1062 (Fla.1987); see also Leet v. State, 595 So.2d 959, 963 (Fla. 2d DCA 1991) (upholding convictions for child abuse and third-degree murder on a culpable negligence theory where the defendant had failed to recognize a pattern of abuse). No evidence shows that even two incidents of abuse took place, much less that multiple incidents of abuse occurred over a substantial period of time. See In re B.S., 697 So.2d at 917; In re D.E.N., 504 So.2d at 516.
Nevertheless, DCFS argues that N.L. knew or should have known that her boyfriend was sufficiently violent or otherwise had a propensity for child abuse such that N.L. "knowingly failed to prevent egregious conduct" by the boyfriend that caused injury to S.W. There is no evidence in the record, however, that the boyfriend was physically abusive or violent in the past with children or with anyone else. Further, the limited circumstantial evidence introduced for the purpose of showing the boyfriend's alleged violent nature *1002 or propensity is insufficient, by itself, to establish a prima facie case that N.L. knowingly failed to prevent her boyfriend's abuse of S.W. See A.R. v. Dep't of Children & Families, 784 So.2d 622, 623 (Fla. 5th DCA 2001) (reversing dependency adjudications as to the siblings where a child died from "shaken baby syndrome" in the absence of evidence that the mother "knew or should have known that [the father] constituted a danger to [the] baby"); In re B.S., 697 So.2d at 917. At most, DCFS showed at hearing that the boyfriend exclaimed "quiet down" to S.W. loudly on one or two occasions; that he had threatened N.L. on one occasion in some unspecified way; that N.L. was aware that he had threatened his pregnant sister with a knife on one occasion; and that N.L. believed the boyfriend and the child did not "click." This circumstantial evidence falls short of showing that N.L. was on notice of any significant risk that her boyfriend would abuse S.W.
According to Dr. Cumming, the child might have been violently shaken on a single occasion for a matter of seconds. This might have taken place while N.L. was in the shower, in the bathroom, or on a short trip to the store. The evidence is fully consonant with the view that the boyfriend who pled guilty to aggravated child abuse perpetrated the abuse outside N.L.'s presence, without her knowledge. In sum, the record does not contain competent substantial evidence that would establish that N.L. harmed S.W.; that she knowingly failed to prevent the boyfriend's misconduct; or that she had any reason to suspect an injury, before S.W.'s arm became red and swollen, at which point she promptly sought medical care for the child.

Subsection 39.806(1)(c)
In order to establish a case under its alternative theory, DCFS was required to adduce clear and convincing evidence that N.L.'s continuing involvement in S.W.'s life threatens her life, safety, health, or well-being and that this threat exists "irrespective of the provision of services." § 39.806(1)(c), Fla. Stat. (2000). Here, the trial court did not address whether, and the record is devoid of evidence that, services had been offered or provided to N.L. or that it would have been futile to have provided her such services. Thus, the requirements of subsection (1)(c) have not been met. See In re J.D.C., 819 So.2d 264, 267 (Fla. 2d DCA 2002).
Section 39.806(1)(c) authorizes termination of parental rights when, despite the provision of all available social welfare services,
the parent or parents engaged in conduct toward the child or toward other children that demonstrates that the continuing involvement of the parent or parents in the parent-child relationship threatens the life, safety, well-being, or physical, mental, or emotional health of the child....
Provision of services may be evidenced by proof that services were provided through a previous plan or offered as a case plan from a child welfare agency.
§ 39.806(1)(c), Fla. Stat. (2000). As the Second District has explained in In re C.W.W., 788 So.2d 1020, 1023 (Fla. 2d DCA 2001)
[I]n order to terminate parental rights under section 39.806(1)(c), the trial court must find that the child's life, safety, or health would be threatened by continued interaction with the parent regardless of any services provided to the parent. In essence, the trial court must find that any provision of services would be futile or that the child would be threatened with harm despite any services provided to the parent.
*1003 Here, DCFS proved that N.L. was impoverished, but not that she was an unfit parent, regardless of the lack of resources. See C.C. v. Dep't of Children & Family Servs., 812 So.2d 520, 522-23 (Fla. 1st DCA 2002). Further, DCFS failed to show that termination of N.L.'s parental rights was the least restrictive way to protect S.W. See Padgett v. Dep't of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991).
The record is devoid of evidence that N.L. was offered a case plan with a goal of reunification. Compare C.L. v. Dep't of Children & Family Servs., 716 So.2d 825, 825 (Fla. 4th DCA 1998) (indicating that, on facts similar to those here, DCFS offered the mother a case plan before seeking to terminate parental rights). Other than some unrelated therapy in 1998, several years before her child was born, N.L. was not provided services either by DCFS or any other social service entity. See In re T.R.F., 741 So.2d 1184, 1185 (Fla. 2d DCA 1999). There is no record evidence that N.L. would be unable to remedy her putative deficiencies, if provided with appropriate services.
Further, there is no evidence that N.L. refused to accept services. See S.D. v. Dep't of Children & Family Servs., 805 So.2d 10, 13-14 (Fla. 3d DCA 2001); In re K.C.C., 750 So.2d 38, 41 (Fla. 2d DCA 1999). Although the trial court could find on this record that N.L.'s conduct and parenting skills needed much improvement, she was not provided an opportunity to cure any deficiencies before DCFS sought to terminate her parental rights. See In re D.W., 793 So.2d 39, 40 (Fla. 2d DCA 2001). While she did not request services, DCFS never offered them.

Conclusion
Because the record does not contain the competent substantial evidence necessary to support termination of N.L.'s parental rights under either section 39.806(1)(c) or 39.806(1)(f), the trial court's order must be reversed. The child remains dependent, however, and we remand to the trial court for further proceedings. Our reversal is based on the state of the record before us. On remand, therefore, DCFS must "consider whether, in light of ... the facts as they exist after remand," J.D.C., 819 So.2d at 267, to offer N.L. a case plan with a goal of reunification. If circumstances exist after remand that satisfy the statutory requirements for termination without such a plan, DCFS may proceed accordingly. If DCFS offers N.L. an appropriate case plan and N.L. fails to comply with the plan, DCFS may again petition to terminate her parental rights.
REVERSED and REMANDED.
BOOTH, BENTON and VAN NORTWICK, JJ., CONCUR.
NOTES
[1] The term "competent substantial evidence" has been defined in DeGroot v. Sheffield, 95 So.2d 912, 916 (Fla.1957), as follows:

We have used the term "competent substantial evidence" advisedly. Substantial evidence has been described as such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred. We have stated it to be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. In employing the adjective "competent" to modify the word "substantial,"... the evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the "substantial" evidence should also be "competent."
(Citations omitted). In short, "[c]ompetent substantial evidence is tantamount to legally sufficient evidence." In re M.F., 770 So.2d 1189, 1192 (Fla.2000).