# Third District Court of Appeal

## State of Florida

Opinion filed March 17, 2021.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D20-1289
Lower Tribunal No. 18-15287
_____

**L.C.A., the Mother,**
Appellant,

vs.

**Department of Children and Families, et al.,**
Appellees.

An appeal from the Circuit Court for Miami-Dade County, Jason E. Dimitris, Judge.

Eugene F. Zenobi, Criminal Conflict and Civil Regional Counsel, Third Region, and Kevin Coyle Colbert, Assistant Regional Counsel, for appellant.

Karla Perkins, for appellee Department of Children and Families; Thomasina F. Moore and Laura J. Lee (Tallahassee), for appellee Guardian ad Litem Program.

Before FERNANDEZ, LOGUE, and MILLER, JJ.

MILLER, J.

In termination proceedings, our legal system is charged with balancing the natural, constitutionally protected right to parent against the government interest in protecting the child from harm. These competing concerns present special challenges in cases involving intimate partner violence. Rather than furnishing adequate resources, our institutional response has often failed to account for the difficulties encountered by victims attempting to gain independence from their abusers. Concluding this is one such case, we reverse.

## BACKGROUND

The child at issue, L.A.C.A., was sheltered after her mother, L.C.A., sustained a violent attack at the hands of her husband, the father. The father was jailed, domestic violence charges were filed, and the criminal court imposed a stay away order, requiring the father to abstain from contact with both the mother and L.A.C.A. L.A.C.A. was placed in the custody of her maternal grandmother, and, on July 23, 2018, adjudicated dependent pursuant to a mediated settlement agreement. Under the terms of the stipulation, the mother conceded she was a nonviolent victim of domestic abuse.

In early January 2019, drawing upon the conclusions rendered in an earlier psychological evaluation, the trial court approved a case plan with a

2

stated primary goal of reunification and a concurrent goal of adoption. The terms of the plan required the mother to avail herself of various therapeutic treatments, including an evidence-based parenting program, trauma-informed individual therapy with a domestic violence component, substance abuse, psychiatric and psychological evaluations, along with ensuing treatment recommendations, individual therapy, parenting and anger management classes, medication management, random urinalysis testing three times per week, and a parent-child observation upon the completion of therapy. Notably, the case plan did not restrict contact between the mother and father.

Upon the father's release from jail, the parents rekindled their relationship.[1] They experienced severe economic difficulties and were temporarily homeless, cohabiting for a time in a car. Predictably, this living situation engendered instability. Law enforcement officers arrested the father for violating the stay away order and the mother for loitering and prowling. The mother declined to cooperate in the domestic violence

---

[1] The father was diagnosed with substance abuse and mental health disorders and assigned his own case plan. He was inconsistent in his therapies, rejected inpatient treatment, failed to appear for several urinalysis appointments, tested positive on one occasion and furnished diluted samples on two others.

proceedings against the father, the stay away order was dissolved, and the State abandoned the prosecution.

The couple then obtained steady employment in the construction industry and acquired an apartment together. They began regularly visiting and contributing to the support of L.A.C.A. Meanwhile, the Department of Children and Families failed to generate several referrals for the mother. This inaction, combined with the mother's economic struggles and lack of communication with the case manager, precipitated significant delays in the projected treatment plan.

In June of 2019, the Department assigned a new case manager and offered the mother an extension and modification, assigning services identical to those required under the original case plan. Referrals ensued, and she eventually completed all required tasks. By all accounts, the mother made positive strides. Her substance abuse disorder remained in remission, and she was medication compliant and engaged in services.

Despite this progress, in late 2019, the Department modified the stated goal to solely reflect adoption. It then filed a petition to terminate the rights of both parents. In support of the petition, it relied upon a failure to substantially comply with the case plan for twelve months after the child was adjudicated dependent, in violation of section 39.806(1)(e)(1), Florida

4

Statutes, and a failure to substantially comply with the case plan while the child had been in care for any twelve of the last twenty-two months, in violation of section 39.806(1)(e)(3), Florida Statues.

The lower tribunal conducted a joint remote trial by videoconference. As relevant to the mother, several experts, along with a multitude of other witnesses, testified. Of note, a psychiatrist, forensic psychologist, and clinical social worker all opined the mother was responsive to treatment and a strong candidate for reunification. One expert testified the mother expressed her intent to prioritize the child over the father, and should the mother move in with the maternal grandmother, the reunification process could begin immediately. Another opined the mother had gained insight into her circumstances, developed the capacity to articulate and identify abusive behaviors and cycles, and improved her ability to communicate in an assertive, rather than argumentative, manner, and recommended the goal of the case plan be changed from adoption to reunification. Yet, a third expert testified the mother said she was "willing to do anything" to regain custody of the child and the mother had fully educated herself on domestic violence.

The Department's own witness, a psychiatrist, denied the mother appeared determined to be with the father and further suggested an updated psychological evaluation, along with a parent-child observation, was

appropriate. Various other witnesses testified mother and child demonstrated a close and loving bond, and the mother, herself, presented no threat of harm to L.A.C.A. However, some suspected the mother was subject to ongoing abuse, as evidenced by various physical injuries, and nearly all were concerned with the lack of progress exhibited by the father.

Finally, although the mother readily admitted she had previously been abused, she denied continuing violence, contending she suffered various injuries while performing manual labor in the course of her employment. She testified there were no restrictions on her visitation with her other two children, and, if faced with such a choice, she would choose L.A.C.A. over her husband "in a hurry."[2]

At the conclusion of the trial, the Department conceded the mother completed all tasks required under the case plan and remained actively engaged in therapy, seeking additional services even after the goal of the plan was changed to adoption. It contended, however, the mother lacked sufficient insight into the circumstances precipitating the dependency proceedings, as evidenced by her failure to sever her relationship with the

---

[2] L.A.C.A. and the other two children are fathered by different men. The latter two, neither of whom are the subject of dependency or termination proceedings, reside with their father.

6

father. The court agreed and terminated the rights of the mother. The instant appeal ensued.

## STANDARD OF REVIEW

In termination of parental rights cases, the Department bears a clear and convincing burden of proof. D.P. v. Dep't of Child. & Fam. Servs. 930 So. 2d 798, 801 (Fla. 3d DCA 2006); see C.G. v. Dep't of Child. & Fams., 67 So. 3d 1141, 1143 (Fla. 3d DCA 2011) (A "finding that evidence is clear and convincing enjoys a presumption of correctness and will not be overturned on appeal unless clearly erroneous or lacking in evidentiary support.") (citation omitted); T.P. v. Dep't of Child. & Fam. Servs., 935 So. 2d 621, 624 (Fla. 3d DCA 2006) ("The standard of review for challenges to the sufficiency of the evidence supporting a termination of parental rights is whether the trial court's order is supported by substantial competent evidence.") (citations omitted). However, we acknowledge our review of the determination by the trial court is "highly deferential."

## ANALYSIS

The fundamental right of parents to procreate and make decisions regarding "the care, custody, and control of their children," Troxel v. Granville, 530 U.S. 57, 66, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000) (citations omitted), is "recognized by both the Florida Constitution and the

7

United States Constitution." D.M.T. v. T.M.H., 129 So. 3d 320, 334 (Fla. 2013). This right "does not evaporate simply because they have not been model parents." Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 1395, 71 L. Ed. 2d 599 (1982). However, it is not absolute but "subject to the overriding principle that it is the ultimate welfare or best interest of the child which must prevail." In re Camm, 294 So. 2d 318, 320 (Fla. 1974) (citations omitted).

Reconciling these basic principles, under Florida law, to terminate parental rights, the Department "must prove by clear and convincing evidence: '(1) the existence of one of the statutory grounds set forth in Chapter 39; (2) that termination is in the best interest of the child; and (3) that termination is the least restrictive means of protecting the child from harm.'" A.H. v. Dep't of Child. & Fams., 144 So. 3d 662, 665 (Fla. 1st DCA 2014) (citation omitted).

Section 39.806, Florida Statutes, provides an exhaustive list of grounds for termination. Although there can be little doubt that domestic violence constitutes a significant public health issue and witnessing such violence has a deleterious effect on many children, proof a parent has

experienced intimate partner abuse is not among them.[3]  See generally §

39.806, Fla. Stat.  Perhaps any such reference was sagaciously omitted, as

to allow for termination based solely upon such a showing of victimization

would constitute a tacit endorsement of the heavily discredited notion the

behavior of the abuser rests within the control of the victim.[4]  Thus, often in

such circumstances, prospective abuse or neglect is alleged.  § 39.806(1)(c),

Fla. Stat.

    In this case, the petition for termination did not allege prospective

abuse or neglect.  Instead, it relied upon a failure to substantially comply with

the assigned case plan.  Firstly, the Department alleged the child continued

to be abused, neglected, or abandoned by the mother, as evidenced by the

---

[3] "[I]f the Legislature wishes as a matter of public policy to qualify a particular child rearing risk as a ground for adjudication, we are confident that it is able to do so."  L.P. v. Dep't of Child. & Fam. Servs., 962 So. 2d 980, 982 (Fla. 3d DCA 2007); see State Farm Fire & Cas. Co. v. Palma, 629 So. 2d 830, 833 (Fla. 1993) (If the scope of a statute is to be expanded, "then the Legislature, rather than th[e] [c]ourt[s], is the proper party to do so.").

[4] See Heidi A. White, Refusing to Blame the Victim for the Aftermath of Domestic Violence Nicholson v. Williams is a Step in the Right Direction, 41 Fam. Ct. Rev. 527, 528 (2003) ("A victim of domestic violence faces an uphill battle, often with very few resources.  . . .  The victim is not in control of the situation; the abuser is."); Scott H. Hughes, Elizabeth's Story: Exploring Power Imbalances in Divorce Mediation, 8 Geo. J. Legal Ethics 553, 576 n.86 (1995) ("While still in the relationship, [often] victims of abuse fail to recognize that they lack control over their abusers['] behavior.") (citation omitted).

fact the mother had not substantially complied with the case plan for a period of twelve months following the placement of the child into care. § 39.806(1)(e)(1), Fla. Stat. Secondly, it alleged the child had been in care for any twelve of the last twenty-two months, and the mother had failed to substantially comply with the case plan so as to permit reunification. § 39.806(1)(e)(3), Fla. Stat. Under either provision, nonperformance occasioned by a "lack of financial resources or the failure of the [D]epartment to make reasonable efforts to reunify," is excused. § 39.806(1)(e)(1), Fla. Stat.; § 39.806(1)(e)(3), Fla. Stat.

Here, although the original case plan was approved shortly after the child was adjudicated dependent, the undisputed testimony established the initial case manager failed to timely provide referrals for treatment.[5] Further, economic hardships endured by the mother created transportation issues. These factors culminated in a nearly one-year delay in treatment.

Despite these early challenges, as commendably conceded by the Department, the mother completed all assigned tasks and continued to actively engage in therapy until the goal of the case plan was abruptly

---

[5] The initial case manager did not testify at trial.

changed.[6]  Nonetheless, the Department urges the mother's failure to gain insight into her circumstances supports the statutory grounds alleged.

Under Florida law, "[a] parent's rights cannot be terminated solely on the imprecise notion that a parent failed to 'gain insight' from services received."  Q.L. v. Dep't of Child. & Fams., 280 So. 3d 107, 116 (Fla. 4th DCA 2019) (citation omitted).  Instead, substantial compliance turns on whether "the circumstances which caused the creation of the case plan have been significantly remedied to the extent that the well-being and safety of the child will not be endangered upon the child's remaining with or being returned to the child's parent."  § 39.01(84), Fla. Stat.

Recognizing "that most families desire to be competent caregivers and providers for their children and that children achieve their greatest potential when families are able to support and nurture the growth and development of their children," § 39.001(1)(b), Fla. Stat., the Florida Legislature has endowed the Department with the responsibility of developing a case plan

---

[6] Invoking estoppel, the mother further argues the Department's formulation of a case plan requiring the child to remain in care beyond the twelve-month statutory ceiling creates an inescapable paradox, as she had but two choices: (1) reject the terms, and in doing so, decline the stated goal of reunification, ensuring a fast-tracked adoption; or (2) consent to the terms, proverbially sealing her own fate by supplying an automatic basis for termination.  The contours of our decision today render it unnecessary to address the merits of this argument.

11

"designed to improve the conditions in the home and aid in maintaining the child in the home, facilitate the child's safe return to the home, ensure proper care of the child, or facilitate the child's permanent placement." § 39.6012(1)(a), Fla. Stat. To that end, the "case plan must be written simply," § 39.6011(2), Fla. Stat., with clear objectives, describing "each of the tasks with which the parent must comply and the services to be provided to the parent." § 39.6012(1)(b), Fla. Stat.

Here, none of the case plans advanced by the Department contained any restriction on contact between the parents. Further, the mother testified that if required to make such a choice, she would unhesitatingly select the child over the father. This testimony was buttressed by her prior statements to the evaluating experts and the refusal by the Department's own expert to endorse the notion the mother was determined to be with the father.

It is well-established that "extricating oneself from an abusive relationship can pose an extremely difficult hurdle for victims of domestic violence." State in Interest of L.M., 453 P.3d 651, 653-54 (Utah Ct. App. 2019). In this vein, the victim "might have been isolated from [his or] her family by the abuser, [he or] she may not be able to afford to go, or [he or]

12

she may realize that leaving is more dangerous than staying."[7] <u>Weiand v. State</u>, 732 So. 2d 1044, 1054 (Fla. 1999) (citation omitted); <u>see</u> Ethan Breneman Lauer, <u>Housing and Domestic Abuse Victims: Three Proposals for Reform in Minnesota</u>, 15 Law & Ineq. 471, 483 (1997) (Victims of domestic abuse "face a Sisyphean task in leaving the abusive home or relationship."). Yet, here, the Department never issued the mother an ultimatum to either sever the relationship or forfeit her parental status. In the absence of such clear direction, we, as was the trial court, are left to speculate as to whether the mother would indeed choose the child "in a hurry."

---

[7] "[T]he most dangerous time for a survivor is when they leave the abusive partner; 75% of domestic violence related homicides occur upon separation and there is a 75% increase of violence upon separation for at least two years." Center for Relationship Abuse Awareness, <u>Barriers to Leaving an Abusive Relationship</u>, http://stoprelationshipabuse.org/educated/barriers-to-leaving-an-abusive-relationship/ (last visited March 16, 2021). Further,

> the idea of simply leaving an abuser [oversimplifies] an incredibly complex situation, particularly when children are involved . . . Moreover, involving law enforcement and obtaining a protective order, or leaving the abuser for a shelter, does not always address a battered woman's needs or ensure safety. Battered women are likely to be killed when they seek help or leave their abusive relationship. As a result, many battered women are "afraid to leave, or worse, stay or return to their abusers thinking they have a better chance of controlling the level of violence while they are with them."

Jacqueline Mabatah, <u>Blaming the Victim? The Intersections of Race, Domestic Violence, and Child Neglect Laws</u>, 8 Geo. J.L. & Mod. Critical Race Persp. 355, 370 (2016) (citation omitted).

Further, although the lower tribunal found additional services would prove futile, the mother continued to progress during her therapy. No witnesses, save the case manager and the guardian ad litem, neither of whom were therapeutic professionals, voiced the opinion that reunification remained elusive. See S.S. v. D.L., 944 So. 2d 553, 558 (Fla. 4th DCA 2007) ("We recognize that the guardian ad litem testified that S.S. was beyond rehabilitation. However, that opinion, which may yet turn out to be correct, was not expert."). Instead, the opposite was true. All experts continually involved in the mother's care opined she had advanced considerably, additional improvement was possible, and safe reunification remained both viable and reasonably foreseeable. Indeed, the Department's own expert testified an updated mental health evaluation and parent-child observation were in order.

Finally, the Department failed to establish no measures short of termination could be used to protect the child from harm. A.H., 144 So. 3d at 665 (citation omitted). As was presciently acknowledged by our sister court recently in a similar context, "the least restrictive means of protecting the child[] would have been for [the Department] to assist [the mother], the victim of domestic violence, in gaining an injunction against the [father] under Chapter 39 (if necessary)," and offering services for her to achieve

14

independence from her abuser, including those designed to facilitate the relocation process.  T.B. v. Dep't of Child. & Fams., 299 So. 3d 1073, 1080 (Fla. 4th DCA 2020).

In conclusion, here, the record established the mother completed her assigned tasks and demonstrated an amenability to further services, and expert testimony supported the proposition that reunification was not untenable, but, instead plausible.  Thus, the findings below do not withstand either our scrutiny or constitutional muster.[8]  See C.A.T. v. Dep't of Child. & Fams., 10 So. 3d 682, 684 (Fla. 5th DCA 2009) ("[I]n order to establish that termination is the least restrictive means, [the Department] must show that the parent will not benefit from court ordered services.") (citations omitted); In re D.L.H., 990 So. 2d 1267, 1273 (Fla. 2d DCA 2008) ("Because there was no evidence that the [mother] would not benefit from court-ordered services, the trial court erred in concluding that the termination of the [mother's] parental rights was the least restrictive means of protecting [the child]."), superseded by statute on other grounds § 39.806(1)(f), Fla. Stat.

Accordingly, we reverse the order under review and remand this cause to the trial court for continuation of the child's dependency status, without

---

[8] Because the evidence failed to sufficiently demonstrate statutory grounds or least restrictive means, we decline to address the findings relating to the best interests of the child.

15

prejudice to the Department to reinstitute termination proceedings, if appropriate, at such time as it is evident that the Department is able to meet "its burden to present clear and convincing evidence of a statutory ground for terminating parental rights, along with clear and convincing evidence that terminating parental rights is [the least restrictive means of protecting the child from harm and] in the best interests of the child." N.L. v. Dep't of Child. & Fam. Servs., 843 So. 2d 996, 999 (Fla. 1st DCA 2003) (citation omitted).

Reversed and remanded.