SUAREZ, J.
The mother, K.R.L., appeals from the trial court’s final judgment terminating her parental rights as to her child, A.M.L. We reverse the order terminating the mother’s parental rights as there is not clear and convincing evidence in the record to support the termination under section 39.806(l)(f) or (g), Florida Statutes (2010).[1]
The child, A.M.L., came into child protective services of the Department of Children and Family Services [“DCF”] at two months of age. The mother had brought the infant to the emergency room on the advice of her child’s pediatrician, after the child fell and hit his head. Further examination of the baby revealed eighteen unexplained rib, leg and arm fractures in various stages of healing, in addition to a skull fracture. The mother denied any knowledge of the injuries except for the skull fracture, which she explained was accidental. DCF was notified and initiated an investigation. DCF subsequently sought termination of both parents’ rights [2] pursuant to sections 89.806(l)(f), (g) Florida Statutes (2010).[3] The record shows that the evidence presented to the trial court did not reach the statutory requirement of “clear and convincing” necessary to terminate the mother’s parental rights.
The State’s expert witness physician, Dr. Biehler, consultant for the University of Miami Child Protection Team, reviewed the child’s medical records and testified that the rib, leg and arm fractures were *938 not injuries that could be sustained in the ordinary course of play or handling a baby. He also testified that it was possible that, if a person did not know what had happened, one might not realize the child’s expressions of pain or discomfort were as a result of a fracture, but might be misinterpreted by a layperson as colic or fussiness. He also testified that the skull fracture was consistent with an accidental injury. The child’s pediatrician, Dr. Lovo, testified that he saw the baby six times over the first two months of the child’s life, including the ten days prior to the child’s removal. He testified that during his examinations of the child he found the baby healthy, happy and content and did not observe any signs of the healing fractures or abuse in question. There is sufficient evidence in the record to implicate the father as the perpetrator of the abuse but not the mother. Detective LaRochelle, the lead detective investigating the allegations of child abuse, testified that he believed the father inflicted the injuries to the child, and also stated that the mother was not a suspect. After hearing from the parties and witnesses, the court concluded that the baby suffered egregious abuse and terminated the parental rights of both the father and mother.
After a thorough examination of the record, we find that record is devoid of the clear and convincing evidence necessary under statute to terminate the mother’s parental rights. See R.P. v. Dep’t of Children & Family Servs., 975 So.2d 435, 436 (Fla. 2d DCA 2007) (holding that a trial court’s determination that clear and convincing evidence supports the termination of parental rights will not be overturned, unless found to be clearly erroneous or lacking in evidentiary support); T.V. v. Dep’t of Children & Family Servs., 905 So.2d 945, 946 (Fla. 3d DCA 2005) (holding that the standard of review where a trial court terminates parental rights on the basis of egregious conduct is whether the order is supported by competent substantial evidence); F.R. v. Dep’t of Children & Family Servs., 826 So.2d 449, 450 (Fla. 5th DCA 2002); M.R. v. Dep’t of Children & Family Servs., 783 So.2d 277, 278 (Fla. 3d DCA 2001).
In order to grant a petition for termination of parental rights, a trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination exists and that termination is in the manifest best interests of the child. See § 39.802(4)(a), (c), Fla. Stat. (2010); Padgett v. Dep’t of Health & Rehabilitative Servs., 577 So.2d 565, 571 (Fla.1991) (holding that, before a parent’s rights can be terminated, the Department must show by clear and convincing evidence that reunification with the parent poses a substantial risk of significant harm to the child). Further, because parental rights constitute a fundamental liberty interest, DCF must establish that termination of parental rights is the least restrictive means of protecting the child or children from serious harm. Id. at 571; see also J.C. v. Dept. of Children and Family Servs., 937 So.2d 184, 193 (Fla. 3d DCA 2006) (holding that natural parents have a fundamental liberty interest in the care, custody, and management of their children); L.D. v. Dept. of Children and Family Servs., 957 So.2d 1203 (Fla. 3d DCA 2007).
All parties, including the mother, accepted the court’s determination that the injuries to the infant constituted egregious abuse under section 39.806(l)(f). A finding of “egregious” abuse allows the court to terminate a parent’s rights without any further proceedings, and provides for termination of a parent who does not inflict the injuries but had the opportunity to prevent the injury and knowingly failed to prevent egregious conduct toward the child. § 39.803(2), Fla. Stat. (2010). Arguing that proposition, the trial court agreed *939 with DCF that the mother “knowingly-failed to prevent” the injuries. The trial court’s order, however, is not based on competent, substantial record evidence, but rather on the trial court’s speculation that the mother “knowingly failed to protect” her child from abuse. This uncertainty as to the mother’s role in her child’s abuse is reflected in the trial court’s order, wherein the judge states that, “[H]ere it is not completely clear to this court other than the presumption of a theory as to who perpetrated the abuse.” This speculation is not “clear and convincing” evidence and is not a valid basis for terminating the mother’s parental rights. See In re C.W.W., 788 So.2d 1020, 1023 (Fla. 2d DCA 2001).
Furthermore, the trial court did not distinguish between the mother and the father when making its required statutory findings, whereas the record certainly provides a basis to distinguish between the father’s behavior versus the mother’s conduct towards the child. The record does not provide any support for the trial court’s generalized conclusions that the mother knew that the father had abused the child, knew that the child had fractured bones or the extent of the child’s injuries, and knowing these things failed to protect the child from harm.[4] In fact, there is affirmative record evidence that the mother took the child to the doctor at every instance the child registered discomfort. The findings of fact in the order under review are inconsistent with the record below. Full and accurate fact finding is essential not only on the question whether DCF has authority to terminate parental rights but also on the question whether it is in the child’s best interests to do so. See § 39.809(5), Fla. Stat. (2009); In re L.H., 647 So.2d 311, 311-12 (Fla. 5th DCA 1994); see also In re K.M., 788 So.2d 306, 306 (Fla. 2d DCA 2001) (noting that when at least one of the grounds for termination of parental rights has been established, the “issue then is whether the DCF proved by clear and convincing evidence the additional requirement that termination is in the manifest best interests of the children”); L.J.R. v. T.T., 739 So.2d 1283, 1287 (Fla. 1st DCA 1999) (stating that in termination of parental rights proceedings, even when statutory requirements are proven, a trial court still must determine whether termination of parental rights is in the child’s manifest best interests).
Given the lack of clear and convincing evidence of the mother’s knowledge of and/or acquiescence to the abuse, we are troubled that DCF never revisited or revised its strategy as to the mother and child to consider a plan of reunification and provision of services once the abusive father was no longer a threat to the child. The record indicates that, not only did the mother eject the father from the home and moved to avoid further contact with him, the father fled the country during the initial proceedings, is subject to arrest upon re-entry to the United States, and is permanently out of the mother’s and child’s life. This changes the entire landscape of the child’s “manifest best interest” considerations with regard to the remaining parent. In fact, expert witnesses testified that if they knew that the person who harmed the child no longer had access to the child, this knowledge would mean that the child was no longer in danger.[5] See *940 A.H. v. Dep’t of Children & Families, 77 So.3d 232 (Fla. 3d DCA 2011) (finding evidence was insufficient to establish that continued interaction with mother threatened the life, safety or health of her children and that the threat could not be remedied by the provision of services, in termination of parental rights proceeding; there was no allegation that mother had harmed her children or had not provided for their care and where father was no longer a threat to the children).
Contrary to the trial court’s order, there is no record evidence to support a finding that the child would be in danger while in the mother’s exclusive care and there is no record evidence that the mother could not provide for the child’s mental or physical well-being. To the contrary, we find affirmative record evidence that the mother is amenable to services,[6] she is healthy, does not abuse drugs, is attending school, provided pre-and post-natal medical care to her child, provided clothing, food, and love for her son while he was in her care, and sent clothing and baby items to him while he was in protective services.[7]
Finding that DCF failed to show by clear and convincing evidence that the mother caused any of the child’s injuries, or knew of the abuse and failed to protect the child from such, we reverse and remand with instructions to dismiss the order terminating the mother’s parental rights, and remand for further proceedings.
Reversed and remanded.

. The Father’s parental rights were also terminated. He has not appealed and that termination order stands.

. The mother's boyfriend, who is the child's father, lived with the mother until she ended the relationship and ejected him from the home after the start of termination proceedings. The record indicates that the father has since fled the country and is subject to arrest upon re-entering the United States.

. Those sections provides that termination of parental rights is appropriate when:
(f) The parent or parents engaged in egregious conduct or had the opportunity and capability to prevent and knowingly failed to prevent egregious conduct that threatens the life, safety, or physical, mental, or emotional health of the child or the child's sibling.
1. As used in this subsection, the term "sibling” means another child who resides with or is cared for by the parent or parents regardless of whether the child is related legally or by consanguinity.
2. As used in this subsection, the term "egregious conduct” means abuse, abandonment, neglect, or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct. Egregious conduct may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child.
(g) The parent or parents have subjected the child or another child to aggravated child abuse as defined in s.827.03, sexual battery or sexual abuse as defined in s.39.01, or chronic abuse.

. Neither did the court find that the mother engaged in any conduct that was "deplorable, flagrant, or outrageous by a normal standard of conduct” as required by § 39.806(l)(f) to sustain termination under an "egregious” conduct standard.

. The expert witness physician, Dr. Biehler, testified that if the perpetrator was no longer present, he would think that the child was no longer in danger. The Guardian ad Litem [GAL] testified that if he knew that the person who caused the injuries was removed from the child’s environment, he would have to *940 reconsider his recommendation for termination of parental rights.

. The mother’s psychologist, Dr. Archer, testified that the mother was not a threat to her child and could benefit from parenting services.

. Moreover, the Guardian ad Litem who testified that termination was proper had met the mother only once and had never observed her interact with her child, and so was unable to testify as to any bond that might exist between them. The trial court acknowledged that the mother, through no fault of her own, has been prevented from seeing her child since he was placed in pre-adoptive foster care, but this is not evidence from which the trial court may conclude that there is no love, affection, or emotional bond between the mother and her child.