DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**D.N.,** the mother,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES** and
**GUARDIAN AD LITEM PROGRAM,**
Appellees.

Nos. 4D19-103 & 4D19-357

[ July 24, 2019 ]

Consolidated appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Yael Gamm, Judge; L.T. Case No. 2018-1743 CJ DP.

Thomas J. Butler of Thomas Butler, P.A., Miami Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Carolyn Schwarz, Assistant Attorney General, Fort Lauderdale, for Appellee Department of Children and Families.

Thomasina F. Moore, Statewide Director of Appeals, and Sara Elizabeth Goldfarb, Senior Attorney, Appellate Division, Tallahassee, for Appellee Guardian ad Litem.

TAYLOR, J.

This is an appeal by the Mother, D.N., from the trial court's judgment terminating her parental rights to her minor daughters, D.A.N. and S.N., after the death of her infant son, A.N. The Father of the children was criminally charged with A.N.'s homicide. Because competent substantial evidence does not support the trial court's finding that the Department of Children and Families ("the Department") proved grounds for terminating the Mother's parental rights by clear and convincing evidence, we reverse the judgment and remand for further proceedings.

On May 13, 2018, the Father was home alone with three-month-old A.N. while the Mother was at work. During this time, the Father fed A.N., placed him on his back, and later realized that formula was coming from

the infant's mouth and nose. He also noticed that A.N. had become limp and unresponsive. At around 9:00 p.m., the Father called the Mother, who in turn called 911 and directed emergency medical personnel (EMS) to their home. When paramedics arrived, they noted that A.N.'s vitals were normal, but they offered to transport him to the hospital for further examination. The Father refused a transport and signed a waiver declining transportation.

When the Mother arrived home from work later that night, she noticed that the baby was listless and appeared to be gasping for air. She asked the Father why EMS did not transport the baby to the hospital. He responded that "they made him" sign the waiver. The Mother insisted they take the baby to the hospital themselves. When they arrived at about 10:40 p.m., the Father reported to the hospital staff that he accidently bumped A.N.'s head when he was removing him from the vehicle. The Mother said she never saw this happen.

A.N. was unresponsive and lethargic. He was examined and intubated before he was transported to a children's hospital. Initial tests returned normal results, but by the next morning, A.N. had "a significant change in mental status," including a bulging fontanelle and sluggish pupils. A CT scan revealed that A.N. was bleeding in his brain and behind his retina. Additional tests indicated that A.N. had two fractured ribs that had begun healing. Medical professionals concluded that A.N.'s injuries were consistent with "suspected abusive head injury," and "Shaken Baby Syndrome."

On May 16, 2018, the trial court ordered the Mother's three children to be placed in shelter care after the report of abuse to A.N. Days later, on May 24, 2018, A.N. died from the injuries he had suffered. Police arrested the Father on criminal charges stemming from the reported abuse.

In June 2018, the Department filed a petition for termination of the Mother's and Father's parental rights to the surviving children, D.A.N. and S.N. The Department alleged grounds for termination of each parent's rights under sections 39.806(1)(f) and 39.806(1)(h), Florida Statutes.

At the termination of parental rights hearing, the Department called several witnesses, including the Mother and Father. The Mother maintained that she was not aware of any abuse by the Father and she implored the court not to lump her parental rights with those of the Father. When called to testify, the Father asserted his Fifth Amendment right against self-incrimination.

A hospital emergency pediatrician, who also assists the Child Protection Team as a child abuse medical provider and medical director, testified. He reviewed A.N.'s medical records and examined him on May 15 and 16. He testified that the rib fractures were callused, which indicated that they were healing and had occurred two to three weeks before A.N. underwent tests related to the May 13 incident. The pediatrician concluded that A.N. had been violently shaken on at least two occasions to cause the rib and brain injuries. He conceded that the Mother was not present for the most recent shaking episode on May 13, but he could not say with certainty whether the Mother or the Father or both had done the previous shaking that resulted in the rib injuries.

The pediatrician testified that A.N.'s medical records showed that the Mother had brought A.N. to see a pediatrician about every two weeks from the time he was born on February 7, 2018 until April 12, 2018. He noted that the child's primary care pediatrician had not previously observed any symptoms of rib injuries or retinal bleeding or identified any signs of abuse. He added that A.N. could have been shaken multiple times between April 12, when he last saw his pediatrician, and May 13. He also conceded that it is possible for a parent who does not inflict the injury to not know that a child with rib fractures is injured. He noted there was no bruising to A.N. and no findings of any rib injuries during A.N.'s regular medical visits to his pediatrician before May 13.

The pediatrician, however, expressed concerns for the safety and welfare of the children in the care and custody of the parents because of two reports of domestic violence between the parents in 2015 and 2017 and a 2009 Orange County dependency case in which D.A.N., who was six months old at the time, had suffered skull, rib, and arm fractures. In that case, the parents completed a court-ordered case plan and maintained custody of D.A.N.

D.A.N. and S.N., ages 10 and 7 respectively, testified at the termination of parental rights hearing. They both stated that they missed their parents and wanted to return home to live with them. The girls added that neither had ever been physically abused by their parents and neither had observed the parents hurting any of the other siblings. The trial court expressed "significant concern" that the girls had been coached because their testimony and that of their maternal grandmother were similar.

In January 2019, the trial court entered a corrected final judgment, in which it terminated both parents' parental rights, based on the criteria and allegations in the termination petition. The trial court expressed its concern for the safety and well-being of the children in the care and

3

custody of their Mother because the Mother demonstrated a "lack of protective capacity." In support of this finding, the trial court stated the following:

> There is a logical reason the Father called the Mother, and not 911, upon determining [A.N.] was unresponsive. The logical inference from the evidence is the Mother knew or should have known of the Father's propensity toward family violence, but would undoubtedly continue in her loyalty toward him and protection of him.
>
> [. . .]
>
> This Court is further cognizant of the fact the Mother did not present the child for any medical evaluations or visits in the month preceding his hospitalization, nor did she present the child to his own grandmother for observation during that period of time, despite the fact that the maternal grandmother was seeing the siblings almost daily.

The trial court found that termination was in the manifest best interest of the surviving children and was the least restrictive means to protect them.

The Mother now appeals the termination of her rights and argues that the Department failed to present clear and convincing evidence that she had: (1) engaged in or failed to prevent egregious conduct, contrary to section 39.806(1)(f), and (2) committed, aided, abetted, conspired, or solicited the murder or manslaughter of A.N., contrary to section 39.806(1)(h).[1]

A trial court's decision to terminate parental rights enjoys heightened deference. *N.L. v. Dep't of Children & Family Servs.*, 843 So. 2d 996, 999 (Fla. 1st DCA 2003). When a trial court finds that there is clear and convincing evidence to support the termination of parental rights, that finding carries a presumption of correctness and will not be overturned unless it is clearly erroneous or lacking in evidentiary support. *Id.* The appellate court does not reweigh the evidence to determine if the clear and convincing standard was met. *Id.* at 999–1000. Instead, the appellate court determines "whether the record contains competent substantial

---

[1] The Father appealed the judgment terminating his parental rights and we affirmed the termination. *See D.N. v. Dep't of Children & Families*, No. 4D19-203, 2019 WL 2225374, at *1 (Fla. 4th DCA May 23, 2019).

evidence to meet the clear and convincing evidence standard." *Id.*

The first step in the decision to terminate parental rights requires a court to find by clear and convincing evidence that at least one statutory ground under section 39.806, Florida Statutes, has been established. *J.G. v. Dep't of Children & Families*, 22 So. 3d 774, 775 (Fla. 4th DCA 2009). Next, the court must evaluate relevant factors, including those enumerated in section 39.810, Florida Statutes, to determine whether termination is in the manifest best interest of the child. *Id.* Once the court finds termination appropriate, the court must determine whether the Department established that termination is the least restrictive means to protect the child from harm. *Id.*

### Termination Under Section 39.806(1)(f)

"A parent's knowing failure to prevent egregious conduct where he has an opportunity to prevent it is a sufficient basis to terminate parental rights under section 39.806(1)(f)." *A.H. v. Fla. Dep't of Children & Family Servs.*, 85 So. 3d 1213, 1216–17 (Fla. 1st DCA 2012). "A finding of 'egregious' abuse allows the court to terminate a parent's rights without any further proceedings, and provides for termination of a parent who does not inflict the injuries but *had the opportunity to prevent the injury* and *knowingly* failed to prevent egregious conduct toward the child." *K.R.L. v. Dep't of Children & Family Servs.*, 83 So. 3d 936, 938 (Fla. 3d DCA 2012) (citing § 39.803(2), Fla. Stat. (2010)). Egregious conduct is defined as "abuse, abandonment, neglect, or any other conduct that is deplorable, flagrant, or outrageous by a normal standard of conduct" and "may include an act or omission that occurred only once but was of such intensity, magnitude, or severity as to endanger the life of the child." § 39.806(1)(f)2., Fla. Stat.

Florida courts have declined to terminate the parental rights of a parent where the facts fail to establish that the parent was involved in the abuse of a child or knew about the abuse but failed to prevent it. *See A.H.*, 85 So. 3d at 1216–17 (reversing the termination of the Father's rights where the Department failed: (1) to present evidence the Father was suspicious or had reason to be suspicious of the Mother before the child's brain injury and (2) to show that the Father knew the Mother had abused the children; or that the Father should have known that the Mother was likely to abuse them in the future); *see also A.H. v. Dep't of Children & Families*, 77 So. 3d 232 (Fla. 3d DCA 2011) (finding the Department's evidence insufficient to establish that the Mother's continued interaction with the children threatened their life, safety, or health, and that the provision of services could not remedy the threat where there were no allegations that the

Mother had harmed the children or had failed to provide for their care and where the Father was no longer a threat to the children); *M.C. v. Dep't of Children & Families*, 186 So. 3d 74 (Fla. 3d DCA 2016) (reversing termination of Mother's parental rights where the finding of egregious abuse by the Mother was based on speculation; there was no direct evidence that the Mother caused the injury to the child and she immediately sought care for the child when the injuries appeared).

The Third District Court of Appeal's decision in *K.R.L. v. Department of Children & Family Services*, 83 So. 3d 936 (Fla. 3d DCA 2012), is instructive in the instant case. In *K.R.L.*, the trial court had terminated the Mother's parental rights based on an alleged failure to prevent the injuries her child suffered as a result of egregious conduct on the part of the Father. *Id.* at 938-39. On appeal, the Third District reversed the termination, finding that there was no evidence that the Mother knowingly failed to prevent the child's injuries and noting that the trial court's order reflected the trial court's uncertainty about who perpetrated the abuse. *Id.* at 939. In addition, the Third District noted that there was affirmative record evidence that the Mother had taken the child to the doctor each time the child had registered discomfort. *Id.* The Third District also expressed its concern that the Department did not consider a plan of reunification for the Mother after the Father had no longer been a threat. *Id.*

Here, competent substantial evidence does not support the trial court's finding of clear and convincing evidence that the Mother participated in the prior incidences of abuse of A.N., knew or should have known about them, or knowingly failed to prevent A.N.'s injuries. On the contrary, the evidence demonstrated that the Department, the court, and the medical professionals were uncertain of the Mother's role in the abuse.

### Termination Under Section 39.806(1)(h)

"Section 39.806(1)(h) provides for termination of parental rights where a parent has committed murder or manslaughter, aided and abetted the murder, or conspired or solicited the murder of another child." *In re E.R.*, 49 So. 3d 846, 852 (Fla. 2d DCA 2010).

The record is utterly devoid of competent substantial evidence to support a finding by clear and convincing evidence that the Mother caused, conspired to cause, or solicited A.N.'s death by murder or manslaughter. The evidence shows that the Mother was at work and not present in the home on May 13, when A.N. suffered the fatal injuries and that she immediately sought emergency care for the child when the Father

6

called her and described the baby's condition.

### *Conclusion*

Because we find insufficient competent substantial evidence to support a finding that the Department proved by clear and convincing evidence any ground for terminating the Mother's parental rights, we need not reach the issues of whether termination was in the manifest best interest of the children and was the least restrictive means to protect them. Accordingly, we reverse the termination of the Mother's parental rights and remand for further proceedings consistent with this opinion.

*Reversed and Remanded for further proceedings.*

MAY and FORST, JJ., concur.

\*      \*      \*

***Not final until disposition of timely filed motion for rehearing.***