DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**J.H.,** the mother,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES** and
**GUARDIAN AD LITEM,**
Appellees.

No. 4D19-718

_____

**Y.H.B.,** the grandmother,
Appellant,

v.

**DEPARTMENT OF CHILDREN AND FAMILIES** and
**GUARDIAN AD LITEM,**
Appellees.

No. 4D19-883

[September 11, 2019]

Appeals from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Yael Gamm, Judge; L.T. Case Nos. 2018-2717-CJ-DP and 2018-2718-CJ-DP.

Denise E. Kistner of the Law Offices of Denise E. Kistner, P.A., Fort Lauderdale, for appellant J.H.

Kathleen K. Peña, Fort Lauderdale, for appellant Y.H.B.

Ashley Moody, Attorney General, Tallahassee, and Carolyn Schwarz, Assistant Attorney General, Office of the Attorney General, Children's Legal Services, Fort Lauderdale, for appellee Department of Children and Families.

Thomasina Moore, Statewide Director of Appeals, and Laura J. Lee, Senior Attorney of Florida Statewide Guardian ad Litem Office, Tallahassee, for appellee Guardian ad Litem.

WARNER, J.

A mother, J.H., appeals the termination of her parental rights to her children O.H. and J.W.H. In a consolidated case, the children's grandmother appeals the denial of her request for the minor children to be placed in her care. We address both appeals in this opinion. We affirm because competent substantial evidence supports the trial court's conclusion that one of the children suffered egregious abuse, and that J.H. failed to protect her child from that abuse. We also affirm the trial court's conclusion that termination is the least restrictive means of assuring the protection of the children. As to the grandmother's appeal, she lacks standing to challenge the termination of J.H.'s rights. Further, even if there were standing to contest the termination of J.H.'s rights, the trial court did not abuse its discretion in denying placement of the children with the grandmother.

J.H. was the biological parent of J.W.H, born in January of 2018, and the legal parent of O.H., born in December of 2017. Her partner, B.D. was the biological parent of O.H. and the legal parent of J.W.H. The two mothers' names appear on each child's birth certificate. Subsequently their relationship ended but they continued living together and co-parenting.

On July 21, 2018, J.W.H. was taken to the hospital and was observed to have catastrophic injuries, including an acute brain bleed, two older brain bleeds, retinal hemorrhages and several bone fractures of varying ages. He was diagnosed with "Shaken Baby Syndrome." The other child, O.H., was examined but no injuries were found. A shelter petition was filed as to both children, and the court found probable cause to shelter due to the parents' inability to provide a safe home for the children. The children were placed with their grandmother, Y.H.B., J.H.'s mother.

Four days after placement with Y.H.B., at the very first supervised visitation, during which both mothers were with the children and present with the grandmother, J.W.H. again suffered a skull fracture and brain bleed. The children were removed from the grandmother, and DCF moved for a no contact order for both mothers and both children in October 2018. Subsequently, DCF sought an expedited termination of parental rights of J.H. and B.D. as to both children on two grounds: egregious abuse

2

(violation of section 39.806(1)(f), Florida Statutes (2018)) and aggravated child abuse (violation of section 39.806(g), Florida Statutes (2018)). The grandmother also filed a private petition to terminate B.D.'s parental rights to the children and requested that the children be placed in either J.H.'s care or the grandmother, Y.H.B.'s, care.

B.D. failed to appear at the advisory hearing, and the court entered a consent on her behalf to termination of her rights. The final hearing proceeded as to both DCF's petition to terminate J.H.'s rights as well as Y.H.B.'s petition.

At the hearing, a doctor from the Child Protection Team testified as an expert, relying on the medical records of J.W.H.'s admissions to the hospital. He concluded that J.W.H.'s injuries resulted from intentional physical abuse. Scans revealed three different brain bleeds of varying ages, a partial herniation of the brain, and multiple broken bones, all of which were consistent with Shaken Baby Syndrome. They were not consistent with physical playing by or with a child. On the second hospitalization, the mothers reported that J.W.H. had fallen on a toy, but the doctor's review showed a new fracture and a brain bleed which would not have been consistent with falling. These injuries were also sustained as a result of physical abuse and were inconsistent with "falling on a toy."

The doctor from the Child Protection Team also opined that the July injuries were severe and would have been fatal but for intervening surgery on the baby's brain. The August injuries were serious but not fatal. Nevertheless, he recommended that neither mother nor anyone else caring for the child in August have contact with the child, as there was no way to determine which of the parents inflicted the child's repeated injuries.

The CPT nurse practitioner, Carla Joseph, who saw J.W.H., confirmed the injuries discussed by the doctor. She met with each mother separately and noted that each gave similar accounts of the day and night prior to taking J.W.H. to the hospital. J.H. reported no concerning signs besides some fussiness. Through her review of what J.H. reported to the doctors at the hospital, she learned that J.H. reported that the baby had stiffening movement and did not follow objects with his eyes, and that these symptoms had been going on for months. Yet J.H. told the nurse that J.W.H. did not have any abnormalities. The nurse was concerned that J.H. told her one story, and the hospital doctors another. It was also concerning that she did not take the baby to a pediatrician when she observed these symptoms. If she had reported these symptoms any doctor would have recommended that she take the baby to the emergency room.

3

While the nurse did not know which parent caused the injuries, she noted that both parents had custody and access to the child in the time prior to his hospitalization.

Another CPT investigator testified that in his interview with B.D., she told the investigator she thought that something had happened to the child at his day care on the day before the hospital admission. However, the CPT investigator spoke to the director of the day care and also observed a video clip, which showed that the child seemed to be alert and happy when he was picked up from the facility that day.

J.H. then testified on her own behalf. She was in a relationship with B.D. since 2015, but severed their relationship after the second incident and the entry of the no-contact order. Earlier in the children's lives, J.H. had to "redirect" B.D.'s parenting style, as B.D. used physical punishment. J.H. also had to address B.D.'s neglect of J.W.H. when he began to cry. Although J.H.'s mother, Y.H.B., had expressed concerns about B.D., J.H. admitted that she "brushed it off," because her mother and B.D. didn't get along. It was not until after the August injuries to J.W.H. that J.H. thought that B.D. had caused her son's injuries. But at the time the children were removed (in August) she had trouble believing that B.D. would hurt J.W.H.

J.H. related her story of what occurred on the night of the July incident. She had come home from work after having a flat tire. She testified that J.W.H. was fussy all evening. She was awakened at 2 a.m. by B.D. who brought her J.W.H. because he was hungry. After nursing the baby, J.H. left to go to Walmart and, while she was there, she received a call from B.D. that J.W.H. wasn't breathing. B.D. called 911. By the time J.H. returned home, paramedics were there and J.W.H. was being taken to the hospital.

In August, while they were at their first supervised visitation at their house with Y.H.B. present, J.H. was playing with O.H. when she heard a smack and heard J.W.H. screaming. She said she saw him lying on his side with his head against a stacking toy. B.D. did not take any action. J.H. picked him up and she and Y.H.B. took him to the hospital.

After J.W.H.'s release from the hospital, J.H. continued with supervised visitation until a no contact order was issued. She sent in-kind support and inquired about the children. She also took a parenting class and installed surveillance equipment to seek reunification with her children.

4

Y.H.B. also testified. She recalled B.D. confessing to her in July that she had hurt J.W.H. while playing with him. While Y.H.B. claimed she told law enforcement, Y.H.B. did not mention this to J.H. until a month later, because J.H. was exhibiting anger and did not want to believe that B.D. could hurt the child. She was present when the second incident occurred in August and testified that she observed B.D. make a quick movement to the right after which J.W.H., who was seated, fell over on the right side of his head.

The child advocate and Guardian ad Litem both testified and recommended that J.H.'s parental rights be terminated. Although neither knew who harmed the child, the baby was not protected by the non-offending parent, and J.W.H. had been injured numerous times.

In its final judgment the court found that both B.D. and J.H. had engaged in egregious conduct or had the opportunity to prevent the egregious conduct that threatened the life and safety of the minor child or the sibling. The judgment concluded:

> 3. . . . Although [J.H.] has argued the culpability for the physical abuse of [J.W.H.] lies entirely with [B.D.], even if this Court had evidence to exclude [J.H.] as the abuser during the entire three-week period preceding [J.W.H.'s] hospitalization, the Court would be hard pressed to conclude there was not a significant amount of willful blindness on the part of [J.H.]. This Court has, on multiple occasions during the course of the testimony, received credible evidence [J.H.] was warned, either through word or circumstance, [B.D.] was a risk to children. [J.H.] treated these warnings with anger and resentment, in light of her loyalty to [B.D.], rather than heeding the red flags and removing her children from a potentially dangerous environment. At best, [J.H.] knew [B.D.] was callous and indifferent to [J.W.H.'s] basic needs, and prone to physical aggression with her child. At worst, this Court is left with clear, convincing, and undisputed medical evidence [J.W.H.] was being severely abused over at least a three-week period of time, during which both parents had care, custody and control over him. Despite evidence the child was observed to be experiencing inordinate symptoms, such as high pitched squealing, excessive drooling, and lethargy in the time leading up to his hospitalization; despite the fact [J.H.] had personally observed concerning behaviors on the part of [B.D.], including physical discipline of a child, and

roughly handling the babies; despite her own mother warning [J.H.] that [B.D.] was a concern around the children; despite [J.H.'s] clear observations that [B.D.] did not have the same level of bonding or concern for [J.W.H.] as she did for her own biological child; and despite [J.H.'s] observation that [B.D.] was not coping well with [J.H.] beginning a relationship with someone new; [J.H.] continued to treat any indication of [J.H.'s] (sic) culpability in [J.W.H's] injuries with anger and denial. This Court further finds [J.H.'s] recitation of the events on the night of [J.W.H.'s] hospitalization suspect and lacking in credibility. Her testimony she had a flat tire and arrived home late, noticed nothing out of the ordinary with [J.W.H.], and then felt the need to go to Walmart in the middle of the night for items completely unrelated to [J.W.H.'s] well-being defies common sense, in light of the medical evidence in the case. Although there is no indication [O.H.] was injured at the hands of either of her parents, it is undisputed [O.H.] qualifies as [] the child's [J.W.H.] sibling, pursuant to statute. Following the statutory amendment in 2014, the Department is no longer required to present evidence of a nexus between egregious harm to one child, and prospective harm to the sibling.

4. Pursuant to Fla. Statute 39.806(1)(g), the mother, [J.H.] has subjected the minor child, [O.H. or J.W.H] . . . to aggravated child abuse as defined in s. 827.03 . . . Here, it is undisputed both parents had equal custody, care and access to [J.W.H.] over the three-week period of time he sustained both his chronic and acute injuries. As noted above, this Court would be hard pressed to conclude [J.H.], either through willful blindness, neglect, or abuse, did not, at a minimum, *subject* her child, [J.W.H.] to chronic abuse through her choice to continuously leave him with an inappropriate caregiver, despite the warning signs. Further, as neither parent gave a credible explanation for how [J.W.H.] sustained his significant, life-threatening injuries, both continued to blame the daycare for the injuries, despite being presented with evidence to the contrary, and the undisputed medical evidence establishes [J.W.H.'s] injuries were inflicted intentionally through chronic abuse associated with Shaken Baby Syndrome, this Court finds both parents equally culpable for the child's life-threatening injuries. This Court's conclusion [J.H.'s] desire to protect [B.D.] took precedence

over her desire to protect her own children is further evidenced by [J.H.'s] statements in September 2018, where she advised her evaluator [J.W.H.] sustained injuries at his daycare. This statement was made weeks after the investigation cleared the daycare of any wrong-doing, and weeks after the August incident where [J.H.] "became convinced" [B.D.] was responsible for [J.W.H.'s] injuries. This Court further notes, despite [J.H.'s] testimony having taken place after the presentation of all of the medical evidence in this case, concluding [J.W.H.'s] injuries were the result of multiple intentional acts of violence, [J.H.] still only went so far as to attribute some negligence and apathy toward [J.W.H.] to [B.D.], and never acknowledged a scenario where [B.D.] would inflict intentional harm upon the child. This Court also notes the parents were told they "better get ahead of this, because DCF is coming" by [Y.H.B.] at the hospital in July 2018, and any explanations for the abuse given subsequently were designed to do just that, and not to protect [J.W.H.].

The court considered the factors set forth in section 39.810, Florida Statutes, and found by clear and convincing evidence that it was in the manifest best interests of J.W.H. and O.H. to terminate parental rights. The court also found that termination of parental rights was the least restrictive means of protecting the children. The court rejected the petition of Y.H.B. From this order J.H. and Y.H.B. both appeal.

Termination of parental rights requires clear and convincing evidence of at least one statutory ground for termination, that the termination is in the child's manifest best interest and that the termination is the least restrictive means of protecting the child. *J.E. v. Dep't of Children and Families*, 126 So. 3d 424, 427 (Fla. 4th DCA 2013). The appellate court reviews termination of parental rights as a mixed question of law and fact.

In *J.G. v. Department of Children and Families*, 22 So. 3d 774, 775 (Fla. 4th DCA 2009), we explained the multi-step process for termination of parental rights. First, the trial court must find by clear and convincing evidence that one of the grounds set forth in section 39.806, Florida Statutes (2007), has been established. Second, the court shall consider the manifest best interest of the child by evaluation of all relevant factors, including those set forth in section 39.810, Florida Statutes (2007). In addition, the Department must establish that termination is the least restrictive means of protecting the child. While a trial court's decision to terminate parental rights must be based upon clear and convincing

evidence, the district court of appeal's review is limited to whether competent substantial evidence supports the trial court's findings. *Id.*

As to J.W.H., J.H. contends that she did not commit the abuse, and no one warned her about B.D.'s abuse. Thus, she contends the Department failed to show that she caused the injury or failed to protect J.W.H. As it explained in its final judgment, the trial court, however, found that there were ample warning signs that J.W.H. was being abused, and its findings are supported by competent substantial evidence. Further, the trial court found that her recitation of the events leading to the July hospitalization were lacking in credibility. That too would factor into the court's conclusion that J.H. at the very least failed to protect the baby from harm. In addition, during the August visitation where both mothers were present, she still failed to protect the child, and the second injury occurred when she was present. At that incident, both mothers and the grandmother testified that the baby fell against a toy, yet the medical experts opined that the injuries suffered by the infant were inconsistent with that mode of injury.

In *D.O. v. S.M.*, 981 So. 2d 11 (Fla. 4th DCA 2007), we affirmed the termination of parental rights of a mother where the baby suffered catastrophic injuries from Shaken Baby Syndrome. The child was in the custody of both parents, but the evidence did not prove which parent was responsible for causing the injuries. Nevertheless, the trial court terminated the mother's rights, because at the very least the mother failed to protect the child from egregious abuse. Similarly, in this case, J.H. failed to protect the child from egregious abuse, while knowing that B.D. acted inappropriately with the child and after being warned by her mother. *See also A.H. v. Dep't of Children & Family Servs.*, 85 So. 3d 1213, 1216-17 (Fla. 1st DCA 2012).

J.H. cites to *K.R.L. v. Department of Children and Family Services*, 83 So. 3d 936 (Fla. 3d DCA 2012) for support, where the court reversed termination of a mother's parental rights. The mother brought a two-month-old baby to the emergency room saying he fell and hit his head. The baby had eighteen unexplained rib, leg and arm fractures in various stages of healing and a skull fracture. The mother denied any knowledge of the injuries except the skull fracture which she said was from the fall. An expert testified that the injuries could not have been sustained in normal handling of a baby, but it was possible that a lay person might not realize that the child's crying were a result of a fracture. Further, the child's pediatrician testified that he saw the baby six times since his birth and did not observe any signs of abuse or fractures. The evidence

implicated the father and not the mother in the abuse. The appellate court concluded that clear and convincing evidence did not provide any support for the trial court's conclusion that the mother knew that the father had abused the child or knew the extent of the child's injuries and failed to protect the child from harm.

In this case, however, there was evidence that despite warnings J.H. failed to protect the child. She had seen abnormal behavior in the child (stiffness and a lack of eye tracking) prior to the July incident which should have alerted her that her child had a problem. She had to admonish B.D. on her behavior with the baby. After the July hospitalization, and despite warnings from her mother, J.H. admitted that she did not take action to prevent B.D. from having contact with the baby. As a result, the baby was injured for a second time during visitation in which J.H. was present. Even in September after a Comprehensive Behavioral Health Assessment (CBHA), J.H. still said that she didn't know how the injuries occurred, even though the second skull fracture occurred in her presence, at a time when B.D. was interacting with the baby. These facts make it distinguishable from *K.R.A.*

We find the remaining cases cited by J.H. for support to likewise be distinguishable on the facts. *See M.C. v. Dep't of Children & Families*, 186 So. 3d 74 (Fla. 3d DCA 2016) (termination of parental rights reversed where there was no competent substantial evidence that the mother inflicted injury or that she knowingly failed to prevent it from occurring, after a single incident of injury to one child, and the mother had fostered fifteen children without any injuries); *A.H. v. Dep't of Children & Family Servs.*, 85 So. 3d 1213 (Fla. 1st DCA 2012) (termination of father's rights to children overturned where there was no evidence that father was aware of mother's abuse of children); *K.A. v. Dep't of Children & Family Servs.*, 880 So. 2d 705 (Fla. 2d DCA 2004) (termination of parental rights as to both parents warranted where infant was severely abused and although evidence did not show which parent inflicted abuse, they were the only persons who had the opportunity to inflict such harm). The trial court's rulings were supported by competent substantial evidence.

J.H. argues that the abuse of J.W.H. should not serve as grounds to terminate her parental rights to O.H., because there was no evidence that she abused or allowed abuse of O.H. She concedes, however, that section 39.806(1)(f) states, as the trial court noted, "Proof of a nexus between egregious conduct to a child and the potential harm to the child's sibling is not required.". She argues, in part, that the same language is not included under section 39.806(1)(g), which the trial court found also as a

9

ground for termination. We need not address this issue, because the appellate court must affirm if there is any ground upon which to support the trial court's termination of parental rights. *See In re Adoption of Baby E.A.W.*, 658 So. 2d 961, 967 (Fla. 1995) (quoting *Kingsley v. Kingsley*, 623 So. 2d 780, 787 (Fla. 5th DCA 1993)). As we affirm the trial court's findings under section 39.806(1)(f), these are sufficient to terminate J.H.'s parental rights to O.H.

In her final point, J.H. contends that termination was not the least restrictive means to protect the children. She argues that she should have been given a case plan to allow reunification with her children. Section 39.806(2), Florida Statutes (2018) states that reasonable efforts to reunify the family are not required where the court determines that events of egregious abuse pursuant to section 39.806(1)(f) or (g) have occurred. The trial court used section 39.806(1)(f) and (g) as grounds for termination, and thus no case plan was required. It also found that the safety of the children could not be assured without termination, and there is competent substantial evidence to support that finding.

As to the grandmother's appeal of the denial of her petition for termination of parental rights, we also affirm. In her petition she requested that the parental rights of B.D. be terminated and requested that the children be placed either with J.H. or herself. After the final hearing, the trial court denied all relief. On appeal, the grandmother contends that the court erred in not considering her to be an appropriate placement for the minor children, as well as challenging the termination of J.H.'s parental rights. DCF and the GAL argue that the grandmother has no standing to appeal the denial of termination of J.H.'s rights, and we agree. Although section 39.802(1), Florida Statutes (2018) would allow the maternal grandmother to be a petitioner seeking to terminate parental rights, that section does not authorize her to challenge the final judgment terminating J.H.'s rights. She was not a party to DCF's petition to terminate J.H.'s rights. Moreover, once the trial court determines to terminate parental rights of a child in DCF custody, as these children are under section 39.811(2), Florida Statutes (2018), placement is for purposes of adoption. Finally, even if the grandmother did have standing, there is competent substantial evidence to support the trial court's determination not to allow placement of the children with the grandmother. She was present for some of the abuse, yet also did nothing to protect J.W.H. Further, in her testimony she claimed that B.D. admitted the abuse, yet she did nothing to prevent her continuing contact with the child.

For the foregoing reasons we affirm the trial court's final judgment terminating parental rights and denying the grandmother's petition.

*Affirmed.*

MAY and KUNTZ, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***